### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RUSTY PAYTON and JUAN SOTO, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 13 C 8002 |
| v. | ) ) | Judge Joan H. Lefkow |
| KALE REALTY, LLC, an Illinois limited liability company, and VOICESHOT LLC, a Delaware limited liability company, | ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Rusty Payton and Juan Soto filed suit against Kale Realty, LLC (Kale) and VoiceShot, LLC (VoiceShot), alleging that defendants sent unsolicited text messages to plaintiffs' cellular telephones in violation of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227(b)(1)(A)(iii). (Dkt. 134 (Second Amend Compl.).) Defendants Kale and VoiceShot have moved for summary judgment. (Dkts. 131, 139.) For the reasons stated below, their motions are granted.[1]

---

[1] The court has jurisdiction under 28 U.S.C. § 1331. Venue is proper in this district under 28 U.S.C. § 1391(b)(2).

## BACKGROUND[2]

During the fall of 2011, Nick Patterson, the sole shareholder of Kale, met in person, had telephone discussions, and exchanged emails with Payton. (*See* dkt. 150 ¶ 5–6.) On December 19 and 23 of that year, Payton sent Patterson three emails to "kalerealty.com." (*Id.* ¶ 8.) Sometime thereafter, still during the month of December, Payton and Patterson exchanged at least five additional emails. (*Id.* ¶ 10.) The emails related to an ongoing discussion between them of "the possibility of merging Payton's business and Patterson's business, and forming a new business entity. . . . Patterson would be the president of the merged business, and Payton would assume the position of managing broker and be an employee of the new business entity." (Dkt. 154 ¶ 14.) In at least three of these emails, Payton provided his cellular telephone number and other contact information to Patterson. (Dkt. 150 ¶¶ 7, 11.) After Payton provided his cellular number to Patterson, Payton never instructed Patterson not to contact him at that number. (*Id.* ¶ 9.) In January 2012, the discussions between Payton and Patterson ended. (Dkt. 154 ¶ 15.)

On October 17, 2013, Payton received a text message on his cellular telephone which read, "Kale Realty named 2013 Top 100 Places to Work by Tribune — We pay 100% on sales — Reply or visit http://joinkale.com to learn more! Rply 68 to unsubscribe." (*Id.* ¶ 16.) Kale used VoiceShot's services to send this text message to Payton. (Dkt. 134 ¶ 17.)

VoiceShot is a Delaware limited liability company that offers web-based communication services that subscribers may access and use through a web-based user interface hosted on

---

[2] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to plaintiffs. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Rule 56.1 are deemed admitted.

VoiceShot's website.  (Dkt. 143 ¶ 10.)  "Voiceshot holds itself out via its publicly available website to serve all potential users of its communications service on the same terms and conditions."  (Dkt. 143 ¶ 18.)  VoiceShot customers can use VoiceShot's group text messaging service to send and receive text messages from telephone numbers that the customer uploads into VoiceShot's system.  (*Id.* ¶ 11.)

"VoiceShot does not provide its subscribers with lists of telephone numbers or otherwise select to whom the subscribers decide to send text messages."  (*Id.* ¶ 12.)  Indeed, VoiceShot does not control any of its subscribers' recipient lists or the content of their messages.  In fact, "VoiceShot subscribers like Kale populate their individual contact lists through one of two methods:  (1) manually inputting telephone numbers; or (2) uploading telephone numbers contained on a separate software file, such as an Excel spreadsheet, into their contacts lists."  (*Id.* ¶ 26.)  Then, to send a group text message, the subscriber must first input the content of the message they wish to transmit and specify the telephone numbers to which the message will be transmitted.  (*Id.* ¶ 28.)  The message will not be transmitted to downstream carriers "unless an individual subscriber directs VoiceShot to transmit the text message at the time of the subscriber's choosing."  (*Id.* ¶ 30.)  After the subscriber has created the content of his or her text message and selected the telephone numbers to be called, the subscriber must hit the "begin" button in the user interface.  (*Id.* ¶ 14.)  VoiceShot then converts the message into a format that a downstream carrier can understand, and ultimately the message is received as a text message.  (*See id.* ¶ 15.)

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## ANALYSIS

### I.    VoiceShot

VoiceShot argues that it is not subject to liability under the TCPA because it is a common carrier and did not initiate the text messages plaintiffs received. VoiceShot also argues that is it not liable because its platform is not an automated telephone dialing system (ATDS).

Under the TCPA, it is unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic

telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C § 227(b)(1)(A)(iii). The TCPA, however, generally does not apply to common carriers. S.Rep. No. 102–78 (1991), 1991 WL 211220 at *9.[3] Indeed, common carriers are immune from TCPA liability unless they have a "high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions." *In the Matter of Rules and Regulations Implementing the TCPA of 1991*, 7 FCC Rcd. 8752, 8780 at ¶ 54 (Oct. 16, 1992) (1992 Order).[4] A telecommunications carrier is treated as a common carrier to the extent that it is engaged in providing telecommunication services. 47 U.S.C. § 153 (51). "The term 'telecommunication services' means the offering of telecommunications for a fee directly to the public or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(53).

Plaintiffs initially respond that VoiceShot cannot be a common carrier because VoiceShot provides information services, not telecommunication services. This argument fails. First, this argument is self-defeating because if VoiceShot provides information services, then VoiceShot is not liable under the TCPA, which is found in Title II of the Communications Act and regulates common carrier telecommunications services. *See Nat'l Cable & Telecomm. Ass'n* v. *Brand X Internet Services*, 545 U.S. 967, 975, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (2005) ("Information-service providers, by contrast, are not subject to mandatory common-carrier regulation under Title II, though the Commission has jurisdiction to impose additional regulatory

---

[3] "The regulations concerning the use of [automated-telephone equipment] apply to the persons initiating the telephone call or sending the message and do not apply to the common carrier or other entity that transmits the call or message and that is not the originator or controller of the content of the call or message." S.Rep. No. 102–78, 1991 WL 211220 at *9 (1991).

[4] The court's compliance with final FCC orders is required. *Toney* v. *Quality Resources, Inc.*, 75 F.Supp. 727, 734 (N.D. Ill. 2014) ("Under the Hobbs Act, the court must apply a final FCC order if it governs the matter at issue.").

obligations under its Title I jurisdiction.").  Accordingly, the plaintiffs cannot simultaneously argue that VoiceShot is liable under the TCPA and that VoiceShot provides information services, which are not regulated under Title II of the Communications Act.

Regardless of plaintiffs' self-defeating argument, the undisputed facts establish that VoiceShot provides telecommunication services rather than information services.  While plaintiff is correct that VoiceShot's services include data storage to allow users to store contact lists and past messages on VoiceShot's website, this does not automatically convert the telecommunications service to an information service.  For example, broadband Internet services were once classified as information-services because "providers of wireline broadband Internet access service offer subscribers the ability to run a variety of applications that fit the definition of information services, including those that enable access to email and the ability to establish home pages."  *In the Matter of Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601 ¶ 323 (Mar. 12, 2015).  But recently the Federal Communications Commission (FCC) determined that although broadband service providers "still provide various Internet applications, including e-mail, online storage, and customized homepages, in addition to newer services such as music streaming and instant messaging," *id.* ¶ 347, broadband Internet access service is a telecommunications service.  *Id.* ¶ 336.  The FCC also found that a service provider with a processing function that converts data and "does not alter the information being transmitted, but rather enables the transmission of the information" is still a telecommunication service.  *Id.*  The FCC explained that functions that are incidental to an underlying telecommunications service that do not alter the information being transmitted but merely enable the transmission of the information are "adjunct-to-basic services," which are telecommunication services.  *Id.*  Thus, although VoiceShot's services provide the ability to store contact lists and convert messages into

a format that a downstream carrier can understand, such functions "do[] not somehow convert the basic telecommunications service offering into an information service," especially where the message sent by the subscriber is the same message received by the recipient. *See id.* Accordingly, this court next must determine whether VoiceShot is a common carrier telecommunication service provider immune from TCPA liability.

### A. Common Carrier Test

Because the TCPA provides little guidance as to the meaning of "common carrier," *see* 47 U.S.C. § 153(11), courts have created a two-part test to determine whether an entity is a common carrier in the communication context. *U.S. Telecom Ass'n* v. *F.C.C.*, 295 F.3d 1326, 1329 (D.C. Cir. 2002); *Rinky Dink, Inc.* v. *Electronic Merchant Syst.*, No. C13–1347–JCC, 2015 WL 778065, at *5 (W.D. Wash. Feb. 24, 2015). An entity is a common carrier only if it (1) "holds itself out to serve indifferently all potential users" and (2) it allows "customers to transmit intelligence of their own design and choosing." *Rinky Dink*, 2015 WL 778065, at *5 (quoting *U.S. Telecom Ass'n*, 295 F.3d at 1329).

### 1. Indifference/Indiscriminate Nature of Services

In assessing whether an entity possesses the first trait of a common carrier, "[t]he key factor is that the operator offer indiscriminate service to whatever public its service may legally and practically be of use." *In Re Fed.-State Joint Bd. on Universal Serv.*, 16 F.C.C. Rcd. 571, 573 ¶ 7 (Dec. 26, 2000) (quoting *Nat'l Ass'n Regulatory Utility Com'rs* v. *F.C.C.*, 525 F.2d 630, 642 (D.C. Cir. 1976)); *see also Iowa* v. *F.C.C.*, 218 F.3d 756, 759 (D.C. Cir. 2000) (same). Here, plaintiffs admit that "Voiceshot holds itself out via its publicly available website to serve all potential users of its communications service on the same terms and conditions." Dkt. 143 ¶ 18; *see also id.* ¶ 19 (admitting that "Voiceshot's subscribers must affirmatively agree to two

7

separate agreements: (1) Voiceshot's terms of Service and (2) Voiceshot's Subscriber Compliance Declaration."); *id.* ¶ 33 ("admitted that the services provided to Kale are the same as the services provided to other Voiceshot customers.").[5] Thus, there is no genuine issue of material fact as to the uniform and indiscriminate nature of VoiceShot's service to its customers.

### 2. Messages of the User's Own Design and Choosing

If engaging with a true common carrier, members of the public must "communicate or transmit intelligence of their own design and choosing." *F.C.C.* v. *Midwest Video Corp.*, 440 U.S. 689, 701, 99 S. Ct. 1435, 59 L. Ed. 2d 692 (1979); *U.S. Telecom Ass'n*, 295 F.3d at 1329. In other words, "[t]he choice of the specific intelligence to be transmitted is, therefore, the sole responsibility or prerogative of the subscriber and not the carrier." *Frontier Broad. Co., et al., Complainants*, 24 F.C.C. 251, 254 (1958). Here, plaintiffs admit that "VoiceShot did not have 'any role in creating the content of' the text message allegedly received by Plaintiff[s]" and "Kale developed the content of the text message allegedly received by Plaintiffs." *Id.* ¶¶ 35–36. Indeed, plaintiffs' own allegations are that "VoiceShot's customers control the type of text messages sent, the content of the text messages, to whom the text messages are sent, and the cellular telephone numbers to which the text messages are sent." Second Amend Compl. ¶ 12. Thus, there is no dispute: VoiceShot allows its customers "to transmit messages of their own design and choosing." *See Rinky Dink*, 2015 WL 778065, at *5.

Therefore, even after drawing all reasonable inferences in plaintiffs' favor, the court finds that VoiceShot is a common carrier for the purposes of assessing liability under the TCPA. The

---

[5] The only material facts relevant to VoiceShot's entitlement to summary judgment that Plaintiffs "deny in part" are based on their contention that "the portion of the record cited does not state whether VoiceShot provides services to other VoiceShot customers 'under the same terms and conditions.'" Dkt. 143 ¶ 33; *see also id.* ¶¶ 20–23, 25. As noted above, Plaintiffs concede elsewhere that all VoiceShot subscribers must agree to the same terms and conditions, *id.* ¶¶ 18–19, such that there is no actual dispute here.

sole remaining question, as to VoiceShot liability, is whether VoiceShot had high involvement or sufficient knowledge to overcome its presumed exemption from TCPA liability.

## B. Highly Involved or Aware of Unlawful Activity Such that Liability is Justified

"A common carrier may be held liable for the unlawful activities of its users if it is found that the carrier:  (1) exercised a high degree of involvement with the unlawful activity, or (2) had actual notice of an illegal use of its services."  *Rinky Dink*, 2015 WL 778065, at *7 (citing 1992 Order, 7 FCC Rcd. at 8780 ¶ 54).

### 1. High Degree of Involvement

"A 'high degree of involvement' exists where the broadcaster (1) controls the recipient lists; and/or (2) controls the content of the transmissions."  *Rinky Dink*, 2015 WL 778065, at *7 (citing *Rules and Regulations Implementing the TCPA of 1991*, 68 F.R. 44144-01, 44169 at ¶ 138 (July 25, 2003)).  Here, plaintiffs agree that VoiceShot does not control any of its subscribers' recipient lists or the content of their messages, and plaintiffs also admit that this was the case for the text messages at issue here.  For example, the following facts are undisputed:  (a) Kale was "solely responsible for the acquisition, provisioning, and/or development of any and all calling lists utilized in the dissemination of [the] Subscriber's messages," (dkt. 143 ¶ 23); (b) "VoiceShot subscribers like Kale populate their individual contact lists through one of two methods:  (1) manually inputting telephone numbers; or (2) uploading telephone numbers contained on a separate software file, such as an Excel spreadsheet, into their contacts lists," (*id.* ¶ 26); (c) "[i]n order to send a group text message, the VoiceShot subscriber must first input the content of the message they wish to transmit and specify the telephone numbers to which the message will be transmitted," (*id.* ¶ 28); (d) "VoiceShot's system will not further transmit a text message to downstream carriers unless an individual subscriber directs VoiceShot to transmit the

text message at the time of the subscriber's choosing," (*id*. ¶ 30); (e) "VoiceShot did not have 'any role in creating the content of' the text message allegedly received by Plaintiff," (*id*. ¶ 35); (f) "Kale developed the content of the text message allegedly received by Plaintiffs," (*id*. ¶ 36); and (g) "Kale developed the telephone number contact list." (*Id*. ¶ 37.)

Nevertheless, plaintiffs assert that even if VoiceShot was acting as a common carrier, VoiceShot is not entitled to common carrier immunity because "VoiceShot was highly involved . . . in the TCPA violation because, without the change in format of the information Kale entered into Voiceshot's website, Plaintiffs would not have received the information as text messages on their cellular phones." (Dkt. 144 at 9.) Plaintiffs further contend that VoiceShot is highly involved because VoiceShot initiated the text messages plaintiffs received. These arguments are unpersuasive.

First, according to plaintiffs, because "Voiceshot designed its systems to convert the information that its customers input in a dialog box on the Voiceshot website into the appropriate format to be received as a text message," Voiceshot had a high degree of involvement in sending the illegal messages. (*Id*. at 9–10.) VoiceShot, however, persuasively argues that plaintiffs' interpretation of the TCPA is flawed because it would "impose TCPA liability on any carrier in the call flow that simply transmits the message, with no logical cut off." (Dkt. 132 at 11–12.) VoiceShot points out the major flaw in plaintiffs' argument: if that were the standard, then plaintiff would also be able to impose liability on plaintiffs' wireless carriers because without plaintiffs' wireless carriers' involvement, it similarly would not have been possible for the text messages to reach plaintiffs. Not only is plaintiffs' argument unpersuasive, it has been rejected by the Seventh Circuit in a different, although related, context. *See Chicago Lawyers Committee for Civil Rights Under Law, Inc.* v. *Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008).

10

In *Craigslist*, plaintiffs insisted that Craigslist became liable for violating the Fair Housing Act when it "cause[d] to be made, printed, or published any [discriminatory] notice, statement, or advertisement" by providing a forum where people can post discriminatory ads. *Id*. In rejecting this argument, the court stated that "[o]ne might as well say that people who save money 'cause' bank robbery, because if there were no banks there could be no bank robberies." *Id*. Here, VoiceShot, just like plaintiffs' wireless carriers, makes it possible for people to communicate with one another, but that does not mean VoiceShot *caused* this message to be initiated over its network, just as people who save money do not *cause* bank robbers to rob a bank.

Second, plaintiffs contend that VoiceShot is highly involved because VoiceShot initiated the text messages plaintiffs received. Plaintiffs rely on *Rinky Dink* but ignore the fact that the court there considered similar facts and found that the platform operator, CallFire, did not initiate the messages received by plaintiffs. In *Rinky Dink*, CallFire similarly had to convert its subscriber's messages into a "SIP packet"[6] and "downstream carriers receive[d] the information via a SIP server and transmit[ted] the message." *Rinky Dink*, 2015 WL 778065, at *9. The court ruled that this process did not constitute message initiation because "CallFire transmits data after the process is initiated by its customers." *Id*. Thus, according to *Rinky Dink*, although VoiceShot took the message input by Kale and changed the format so that Kale's message would be received as a text message by plaintiffs, VoiceShot did not initiate the text messages plaintiffs received.

Moreover, VoiceShot's actions do not amount to "initiation" as defined in the July 2015 FCC declaratory ruling. *See In the Matter of Rules & Regulations Implementing the Tel.*

---

[6] "SIP" stands for Session Initiation Protocol. *See* VoIP Mechanic, http://www.voipmechanic.com/glossary-voip.htm (last visited December 17, 2015).

*Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961 (2015). There, the FCC examined several Internet-based transmitters of text messages and clarified what actions would render the transmitter sufficiently involved in selecting the content, timing, and recipient of messages so as to give rise to liability under the TCPA. The FCC used Glide, a video messaging service platform, to illustrate a transmitter that was deemed to initiate messages. *Id*. at 7982–83 ¶ 34–35. Once Glide was downloaded to a device, it would automatically send out a text message Glide composed to all of the device owner's address book contacts inviting them to download Glide unless the owner opted out. *Id*. at 7983 ¶ 35. The FCC determined that Glide was "so involved in [initiating the text messages] as to be deemed to have made or initiated them." *Id*. In contrast, the FCC found that TextMe's platform was not so involved as to determine that TextMe initiated the messages sent to selected recipients. *Id*. at 7984 ¶ 37. Unlike Glide, users of TextMe had to take several steps to invite their friends to download the service. *Id*. TextMe users had to select whether to invite all of their contacts, only specific contacts, or none of their contacts. *Id*. Then TextMe sent a text message it authored to the selected recipients. *Id*. Although the FCC expressed concern that the TextMe composed the message sent, it determined that the affirmative steps taken by the users to decide whether to send the message was sufficient to prevent a finding that TextMe initiated the messages. *Id*.

Here, undisputed facts establish that VoiceShot's degree of involvement in sending text messages to plaintiffs is less than TextMe's involvement in sending invitational text messages. As was the case with TextMe, VoiceShot requires its users to take affirmative steps to determine whether, when, and to whom they would send text messages. *See* I.B.1, *supra*. Plaintiffs have admitted that VoiceShot customers must "specify the telephone numbers to which the message will be transmitted," dkt. 143 ¶ 28, and that "VoiceShot's system will not further transmit a text

message to downstream carriers unless an individual subscriber directs VoiceShot to transmit the text message at the time of the subscriber's choosing." *Id.* ¶ 30. Plaintiffs do not allege that VoiceShot sent messages to a user's contact without the user's intervention in a way that would make VoiceShot similar to Glide. *See Kaufmann* v. *CallFire, Inc.*, 2015 WL 6605459 (S.D. Cal. Oct. 8, 2015). Furthermore, unlike TextMe, "VoiceShot did not have 'any role in creating the content of' the text message allegedly received by Plaintiff." Dkt. 143 ¶ 35. Thus, VoiceShot is less involved in initiating text messages than TextMe. Since the FCC has determined that TextMe did not initiate the text messages received by plaintiffs, this court similarly finds that VoiceShot did not initiate the text messages plaintiffs received.

### 2. Actual Knowledge of Unlawful Activity

In addition to a transmitter's involvement in selecting the content, timing, and recipients of messages, "whether a person who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes may also be a factor in determining whether the platform provider is so involved in placing the calls as to be deemed to have initiated them." 30 FCC Rcd. at 7980–81. The FCC recently explained,

> [I]f the Commission staff notifies a platform provider that its service is being used unlawfully by its clients and the platform provider then allows such usage to continue after this warning, we will consider the fact that the platform provider allowed such usage to continue after having actual notice of the unlawful activity to be a possible indicator that the platform provider is actively participating in the making or initiating of the calls at issue. Of course, we will consider all facts and circumstances surrounding any possible violation(s) before determining how liability, if any, should be applied.

30 FCC Rcd. at 7981 n. 110. Here, plaintiffs do not allege that after VoiceShot received actual knowledge of unlawful activity by Kale it continued to allow such usage. In fact, it is undisputed that "[w]hen VoiceShot became aware of Plaintiff Payton's claim that he allegedly received an

13

unsolicited text message from Defendant Kale, VoiceShot terminated Kale's subscription to VoiceShot's common carrier services."  (Dkt. 143 ¶ 40.)  Accordingly, no reasonable trier of fact could find that VoiceShot had actual notice of the allegedly unlawful text messages initiated by Kale and failed to act.

Because VoiceShot is entitled to immunity under the TCPA as a common carrier, summary judgment must be granted in its favor.[7]

## II.     Kale

In Kale's motion for partial summary judgment, Kale argues that (1) the text message sent to Payton was not an advertisement but instead was merely an employment "want ad," and (2) Payton gave prior express consent to Kale to send him the text message because Payton's cellular telephone number was listed in the signature box of his emails sent to defendant Kale. Plaintiffs argue, however, that the court should not grant Kale's motion for partial summary judgment because (1) the text message to Payton contained an advertisement for Kale's products and services, making the text message a telemarketing call subject to a stricter level of consent from Payton, and (2) Kale did not obtain prior express consent from Payton, especially not the prior written express consent required for telemarketing calls.

### A.     Whether the Text Message Received by Payton was an Advertisement or Telephone Solicitation

As stated above, the TCPA makes it unlawful for any person to make a call using an ATDS or a prerecorded voice to a cellular telephone.  47 U.S.C. § 227(b)(1)(A)(iii).  The TCPA authorizes the FCC to exempt by rule or order

(i)   calls that are not made for a commercial purpose; and

---

[7] Because the court concludes that VoiceShot is not liable due to its status as a common carrier that did not initiate the messages plaintiffs received, the court need not address VoiceShot's second argument, that it is not liable because its platform does not constitute an ATDS.

> (ii) such classes or categories of calls made for commercial purposes as the Commission determines
>> (I) will not adversely affect the privacy rights that this section is intended to protect; and
>> (II) do not include the transmission of any unsolicited advertisement.

*Id.* at § 227(b)(2)(B). The FCC's implementing regulations make it unlawful to use an ATDS, or a prerecorded voice, to initiate a call to a cellular telephone "that includes or introduces an advertisement or constitutes telemarketing." 47 C.F.R. § 64.1200(a)(1)–(2). Thus, the court must first examine whether the text message sent to plaintiff "includes or introduces an advertisement" *or* "constitutes telemarketing."

### 1.    "Includes or Introduces an Advertisement"

The FCC's regulations define "advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1). "Whether a given call includes or introduces an 'advertisement' depends on the call's content." *Dolemba* v. *Illinois Farmers Insurance Co.*, No. 15 C 463, 2015 WL 4727331, at *2 (N.D. Ill. Aug. 10, 2015) (citing *Golan* v. *Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015)). For example, a call that seeks to hire individuals to sell a defendant's products may constitute an advertisement "if the individuals called are encouraged to purchase, rent, or invest in property, goods, or service, during or after the call." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14098–99 ¶ 142 (July 3, 2003). "[A] mere recruitment call," however, "is not actionable." *Dolemba*, 2015 WL 4627331, at *2 (internal quotation marks omitted); *see also Friedman* v. *Torchmark Corp.*, No. 12-CV-2837-IEG (BGS), 2013 WL 4102201, at *5 (S.D. Cal. Aug. 13, 2013) (finding that a message "inviting Plaintiff to attend a recruiting webinar wherein Plaintiff could learn about

Defendant's products to potentially sell them is similar to an offer of employment"); *Lutz App. Servs., Inc.* v. *Curry*, 859 F. Supp. 180, 181 (E.D. Pa. 1994) (similar).

Here, plaintiffs assert that defendants sent text message advertisements that were more than mere help-wanted postings. In doing so, plaintiffs cite to *Green* v. *Time Insurance Co.*, 629 F. Supp. 2d 834 (N.D. Ill. 2009) and *Brodsky* v. *HumanaDental Insurance Co.*, No. 10 C 3233, 2014 WL 2780089 (N.D. Ill. 2014). This court, however, finds that the facts here are analogous to *Dolemba*, a case in which another judge of this court distinguished *Green* and *Brodsky* and found *Friedman* directly on point. *See Dolemba*, 2015 WL 4727331, at *4.

In *Dolemba*, the plaintiff alleged that the defendant sent a prerecorded message inviting him to attend a "town hall call offering a business opportunity promoting the commercial availability of insurance, goods, intangibles and services." *Dolemba*, 2015 WL 4627331, at *1. The plaintiff further alleged that the "business opportunity requires the new agent to acquire goods and services and expend money to [*sic*] or for the benefit of" Farmers. *Id.* There, the court found that "[t]he fact that the call informed Dolemba what he would be selling ('insurance'), without more, does not make the call an advertisement." *Id.* at *4. Accordingly, the court held that plaintiff had not adequately alleged that the call he received included or introduced an advertisement. *Id.*

To reach this conclusion, the court analogized to *Friedman*. In *Friedman*, the plaintiff alleged that the defendant sent a prerecorded message inviting him to contact the defendant "at a specific telephone number to attend a 'recruiting webinar' . . . wherein [plaintiff] could learn about [defendant's] products and services in order to sell said products and services to other Americans who are in need of health or similar insurance policies." *Friedman*, 2013 WL 4102201, at *1. Individuals who completed the webinar received an email that "provide[d] the

16

opportunity to enter into a contract with" the defendant, which contained fees the individual would have to pay to sell the defendant's products, in exchange for which the defendant would supply client lists. *Id*. In *Friedman*, the court held that the call offered the plaintiff the opportunity to "enter into an independent contractor relationship," and was "not part of an overall marketing campaign to sell access to a customer database." *Id*. at *5. The court explained that "the mere fact that after an individual enters into an independent contractor relationship with Defendant and the individual may choose to purchase the 'Turning 65' list does not mean that Defendant's message was advertising the commercial availability of goods and services." *Id*. As such, the court there dismissed the TCPA claims against defendants.

Here, the text message Payton received, read, in its entirety, "Kale Realty named 2013 Top 100 Places to Work by Tribune – We pay 100% on sales – Reply or visit http://joinkale.com to learn more! Rply 68 to unsubscribe." (Dkt. 151 at 4; *Id*. Tab 8.) As Kale points out, because there is no reference to the sale of goods or services in Kale's text to Payton, plaintiff has to delve into the details of how the employment for Kale agents works and in doing so assert that Kale is selling their agents something. Kale admits that it does not hire real estate agents as employees but, rather, as "independent contractors who are sponsored by Kale." (Dkt. 154 ¶ 2–3.) Although there is disagreement as to whether Kale charges its employees for various services performed or provided by Kale, this does not prevent resolution of this issue. As indicated above, the court in *Friedman* explained that "the mere fact that after an individual enters into an independent contractor relationship with Defendant and the individual may choose to purchase" services and goods from defendant to carry out the individual's work, "does not mean that Kale's message was advertising the commercial availability of goods and services." *See Friedman*, 2013 WL 4102201, at *5. Therefore, this court finds that, even after drawing all reasonable

inferences in plaintiffs' favor, the message received by plaintiffs is not an "advertisement" under the TCPA.

## 2.    Telephone Solicitation (Telemarketing)

The TCPA's implementing regulations define "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  47 C.F.R. § 64.1200(f)(12).  Unlike the inquiry as to whether the call includes or introduces an advertisement, the "telemarketing" inquiry focus on the purpose of the call, rather than its content.  *See Golan*, 788 F.3d at 820.  Where the implication of an improper purpose is clear from the context, the TCPA does not "require an explicit mention of a good, product or service."  *Dolemba*, 2015 WL 4727331, at *4 (quoting *Chesbro* v. *Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012)).

In *Dolemba*, the court thoroughly examined numerous cases to determine whether the call at issue constituted telemarketing.  There, the court once again found that the facts in *Dolemba* were more analogous to *Friedman* than any other case addressed.  *Id.* at *5.  In *Friedman*, the court found that the defendant's messages did not constitute "telephone solicitations because the messages are not intended to encourage Plaintiff to engage in future commercial transactions with Defendant to purchase or invest in property, goods, or services."  *Friedman*, 2013 WL 4102201, at *6.  The *Friedman* court explained,

> Even though Plaintiff argues that Defendant is encouraging individuals to invest money in its brokerage services through its messages through the purchase of the "Turning 65" list, the Court finds that the intent of the messages is not to encourage an individual to by [*sic*] the "Turning 65" list or access to the customer-base, but rather to inform them about an independent contractor opportunity with Defendant.

*Id*.  Similarly, here, even though plaintiffs argue that Kale is encouraging individuals to purchase various services performed or provided by Kale, the court finds that the intent of the message is

not to encourage an individual to purchase any of Kale's services but rather to inform plaintiffs about an opportunity to become an independent contractor for Kale. As such, the court finds that even after drawing all reasonable inferences in plaintiffs' favor, Kale's text message does not constitute "telemarketing" as the TCPA defines it.

### B. Prior Express Consent

Under the TCPA, a caller must have "prior express consent" from the consumer to make a call using an autodialer. *In re Rules and Regs. Implementing the Tel. Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1832 ¶ 4, (Feb. 15, 2012) (2012 Order), citing 47 U.S.C. § 227(b)(1)(A). In 2012, the FCC "revise[d its] consent rules to require prior written consent for autodialed or prerecorded *telemarketing* calls." *Id*. at 1841 ¶ 28 (emphasis in original). It maintained, however, "the existing consent rules for *non-telemarketing* calls." *Id*. In other words, non-telemarketing calls "require either written or oral consent if made to wireless consumers." *Id*. As discussed *supra*, the facts here involve a non-telemarketing call to plaintiffs' wireless phones. Thus, this court disagrees with plaintiffs that the heightened written consent requirement applies in this case.

Although the FCC provides no definition for "prior express consent," the FCC has established rules and interpretations for determining when a consumer has given prior express consent. In 1992, the FCC determined that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." 1992 Order, 7 FCC Rcd. at 8769 ¶ 31. For some time thereafter, federal courts interpreted this as a general rule that providing one's cellular number constitutes prior express consent. *See Van Patten* v. *Vertical Fitness Group*, 22 F.Supp.3d 1069 (S.D. Cal. 2014); *Martin* v. *Comcast Corp.*, No. 12 C 6421, 2013 WL

6229934 (N.D. Ill. 2013). In *Kolinek*, however, a judge of this court reanalyzed the FCC's 1992 order and found that other language in the order could not be squared away with this general rule. *Kolinek* v. *Walgreen Co.*, No. 13 C 4806, 2014 WL 3056813, at *4 (N.D. Ill. July 7, 2014). In its 2012 order, the FCC stated that even when consumers provide their telephone number for legitimate, non-telemarketing purpose, the consumers do not expect to receive calls "that go beyond the limited purpose for which . . . consent may have been granted." *Kolinek*, 2014 WL 3056813, at *3 (citing 2012 Order, 27 FCC Rcd. at 1839 ¶ 25.) Accordingly, the *Kolinek* court determined that "to the extent the FCC's orders establish a rule, it is that the scope of a consumer's consent depends on its context and the purpose for which it is given. Consent for one purpose does not equate to consent for all purposes." *Kolinek*, 2014 WL 3056813, at *4.

This court is persuaded by the analysis in *Kolinek* and applies it here. As such, the court addresses two questions: first, whether Payton provided his cellular phone number to Kale; and second, whether Payton's act of giving Kale his cellular number amounts to prior express consent, resulting in permission for Kale to send Payton the text message at issue in this case.

### 1. Whether Payton Provided His Cellular Phone Number to Kale

The first question is a factual question: whether Payton provided Kale with his cellular telephone number. Because the plaintiffs make numerous admissions as to this issue, the court finds there is no genuine issue of material fact as to whether Payton gave Kale his cellular phone number. The following admissions by plaintiffs support this conclusion: (1) "Payton and Patterson met in person, had telephone discussions, and exchanged emails for the limited purpose of merging their respective real estate business," (dkt. 150 ¶ 6); (2) "On December 19, 2011 and December 23, 2011, Plaintiff sent three emails to Nick Patterson, the owner of Kale Realty LLC, which contained his cellular telephone number and other contact information," (*id*.

¶ 7); and (3) "After providing his cellular telephone number to Nick Patterson in those three emails sent on December 19, 2011 and December 23, 2011, Plaintiff never instructed Nick Patterson not to contact him at his cellular telephone number." (*Id*. ¶ 9.)

### 2. Whether Payton's Act of Giving Kale His Cellular Phone Number Constituted Prior Express Consent

The second question is a legal question: whether the three emails in which Payton provided his cellular number to Patterson amount to prior express consent for Kale to send Payton a text message stating, "Kale Realty named 2013 Top 100 Places to Work by Tribune – We pay 100% on sales – Reply or visit http://joinkale.com to learn more! Rply 68 to unsubscribe." The question as to what constitutes "express consent" is also a question of the scope of consent.

Plaintiffs argue that the court should not grant summary judgment because Kale exceeded the scope of any alleged consent. To supports its position, plaintiffs cite to *Kolinek*. In *Kolinek*, plaintiff provided Walgreens with his cellular number after a pharmacist told him that his phone number "was needed for verification purposes (i.e. if another customer named Robert Kolinek attempted to fill a prescription at the same Walgreens, the pharmacist would be able to confirm the correct person using the phone number on record)." *Kolinek*, 2014 WL 3056816, at *1. Sometime thereafter, Kolinek began receiving automated "robocalls" on his cellular phone from Walgreens reminding him to refill his prescription. *Id*. Based on these calls, Kolinek filed suit against Walgreen alleging violations of the TCPA. *Id*. There, the court found that the complaint alleged that Kolinek gave his cellular phone number in response to a request from a pharmacist who said it "was needed for potential identity verification purposes," and as such providing his number to Walgreens did not "amount to consent to automated calls reminding him to refill his

prescription." *Id*. at *4. The court, thus, denied defendant's motion to dismiss. *Id*. The court here finds *Kolinek*'s facts distinguishable.

In this case, plaintiffs admit that the emails sent from Payton to Kale for the purpose of merging their respective real estate businesses contained Payton's cellular telephone number and other contact information. Unlike *Kolinek*, however, where the messages reminding plaintiff to refill his prescription were not related to the initial reason for disclosing his cellular number (for identity verification purposes), here, the text message offering plaintiff an opportunity to enter into an independent contractor relationship is related to the initial reason for which Payton disclosed his cellular phone number (for business discussions regarding a potential merger). Put differently, the initial reason for disclosing Payton's cellular telephone number to Kale was to engage in discussions of developing a business relationship, and the text message received approximately two years after merger discussions had ended also related to developing a business relationship, albeit a different type of business relationship (i.e., independent contractor rather than employee).

Plaintiffs also take issue with the "lengthy time span between the communications" in December 2011 and the text message in October 2013. (Dkt. 149 at 14.) The time lapse of almost two years, however, is of no significance, because consent under the TCPA does not have an expiration date and is considered effective until revoked. *Van Patten* v. *Vertical Fitness Group, LLC*, 22 F. Supp. 3d 1069, 1077 (S.D. Cal. 2014); *see Kolinek* v. *Walgreen Co.*, No. 13 C 4806, 2014 WL 518174 (N.D. Ill. Feb. 10, 2014) (noting that any argument as to the validity of the consent due to the passage of ten years between plaintiff providing his cellular number and receiving the allegedly unlawful call would fail because consent under the TCPA does not expire on its own), *vacated on other grounds* in *Kolinek*, 2014 WL 3056813; *see also*

*Murphy* v. *DCI Biologicals Orlando, LLC*, No. 6:12–cv–1459–Orl–36KRS, 2013 WL 6865772 (M.D. Fla. Dec. 31, 2013) (the two year time lapse between the communications was insignificant). Lastly, the fact that merger discussions had ended is of no importance here. *Cf. Van Patten*, 22 F. Supp. 3d at 1077–78 ("[T]he Court is not persuaded that by merely cancelling his membership, Van Patten revoked his prior express consent to be contacted.").

Because the court finds there is no genuine issue of material fact as to whether Payton provided prior express consent to receive the text message at issue in this case, defendant Kale is entitled to judgment as a matter of law as to Payton.

## CONCLUSION AND ORDER

For the foregoing reasons, VoiceShot's and Kale's motions for summary judgment (dkt. 131, 139) are granted. Defendant VoiceShot is dismissed as defendant in this case. The case continues with respect to plaintiff Soto and defendant Kale. The case is set for a status hearing on March 8, 2016 at 11:00 a.m. The parties are directed to discuss the possibility of settlement and whether a referral to the designated magistrate judge would be useful in that regard.

Date: February 22, 2016

_____

U.S. District Judge Joan H. Lefkow